**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**December 21, 2023**

# In the Court of Appeals of Georgia

A24A0389. COOPER et al. v. POLLARD et al.

A24A0449. MORGAN v. COOPER et al.

A24A0450. POLLARD v. COOPER et al.

PIPKIN, Judge.

These consolidated appeals challenge orders entered by the Superior Court of Mitchell County in a quo warranto action. More specifically, Case Nos. A24A0449 and A24A0450 challenge the trial court's order entering default judgments in the quo warranto action, and Case No. A24A0389 is an appeal from an order in which the court refused to rule on a motion for contempt of the default judgment due to the automatic supersedeas set out in OCGA § 5-6-46 (a). We have expedited these appeals and, as more fully set forth below, affirm in all three cases.

1. Pertinent to these appeals, the record shows that Corey B. Morgan and Venterra Pollard (collectively "Respondents") were elected as District 1 council

members for the City of Camilla, Georgia ("City") on December 31, 2019 and 2021,[1] respectively. In November 2022, David Cooper and Joe Bostick (collectively "Petitioners") filed an "Application for Leave of Court to File an Information in the Nature of a Petition for Quo Warranto" and a "Verified Petition for Quo Warranto" seeking to remove Respondents from the council on the basis that they did not meet the residency requirements imposed by Georgia law and the Charter for the City.[2] The petition sought a declaration concerning Respondents' ability to serve as council members under both OCGA § 9-6-60, the quo warranto statute, and OCGA § 9-4-1, the declaratory judgment statute.

Petitioners request to proceed with a quo warranto inquiry was granted; thereafter, Petitioners served Respondents with the quo warranto petition, along with interrogatories and requests for production of documents. Respondents, both of whom

---

[1] This means that Morgan's term ends on December 31, 2023, and Pollard's term ends on December 31, 2025.

[2] Under these provisions, Respondents were required to be residents of the district they serve for a continuous period of twelve months prior to being elected to the council, and to continue to live in their elected district during the period they served on the council. Petitioners alleged that, during at least parts of the relevant time period, Morgan resided in Pelham, Georgia, and Pollard resided in Albany, Georgia. The District 1 residence Morgan claimed as his permanent residence was owned by his grandmother, and Pollard's alleged District 1 residence was owned by his sister.

appeared pro se, filed answers to the petition and unverified responses and objections to the discovery requests. As explained more fully below, Respondents resisted Petitioners' discovery efforts, and Petitioners filed several motions to compel and motions to strike Respondents' answers and defenses based on discovery violations. After several hearings and the entry of several orders compelling discovery, the trial court, in a 30-page order, granted Petitioners' motion to strike and entered a default judgment on their quo warranto petition ("final judgment"). In addition to extensive fact-finding and determinations about Respondents' discovery violations, the order also contained specific declarations that Respondents were not residents of the City, that they lacked the authority to act as members of the council, and that their positions were vacant. Respondents, who have continued to represent themselves throughout these proceedings, timely filed separate notices of appeal from the final judgment[3]; Morgan's appeal was docketed in this Court as Case No. A24A0449, and Pollard's appeal was docketed in this Court as Case No. A24A0450.

After the trial court entered its final judgment, Petitioners believed that Respondents continued to participate in council activities as if they had not been

---

[3] Respondents originally filed their notices of appeal to the Supreme Court of Georgia. The Supreme Court transferred the appeals to us after they determined that this Court had jurisdiction of the appeals.

removed from office, prompting Petitioners to file an emergency motion for contempt, as amended, in the trial court. Following a hearing, the trial court entered an order to the effect that it had been divested of jurisdiction to rule on the motion when Respondents filed their notices of appeal and paid costs and, accordingly, refused to entertain the motion ("supersedeas order"). Petitioners filed a notice of appeal from that order, and that appeal has been docketed in this Court as Case No. A24A0389.

*Case No. A24A0389*

2. We turn first to Petitioners' challenge to the trial court's supersedeas order.[4] In pertinent part, OCGA § 5-6-46 (a) provides that "[i]n civil cases, the notice of appeal . . . shall serve as supersedeas upon payment of all costs in the trial court by the appellant[.]" Thus, "'[a]s a general rule, in civil actions other than injunctions, a trial court, upon the filing of a notice of appeal, loses jurisdiction to modify or enforce a judgment which is the subject of the appeal during the period of supersedeas.' *Davis*

---

[4] Neither Morgan nor Pollard has filed an appellee's brief in Case No. A24A0389. The City of Camilla has, however, filed an amicus brief in support of the trial court's supersedeas order. We also note that, although we affirm the final judgment in Case Nos. A24A0449 and A24A0450, this issue is not moot. "An appellate court maintains jurisdiction over a case until it has issued the remittitur and the remittitur has been received and filed in the clerk's office below. Only then does the trial court regain jurisdiction to take further action with respect to the judgment appealed." (Citation and punctuation omitted.) *Fred Jones Enterprises, LLC v. Williams*, 331 Ga. App. 481, 485 (2) (771 SE2d 163) (2015).

4

*v. Harpagon Co.*, 281 Ga. 250, 253 (8) (637 SE2d 1) (2006)." *Mughni v. Beyond Mgmt. Group, Inc.*, 349 Ga. App. 398, 402 (3) (825 SE2d 829) (2019).

(a) Petitioners acknowledge the general applicability of OCGA § 5-6-46, but, citing *Bankers Life and Cas. Co. v. Cravey*, 209 Ga. 274 (71 SE2d 659) (1952) and other mandamus cases, they argue that the automatic supersedeas provisions of OCGA § 5-6-46 (a) do not apply to cases involving extraordinary remedies. We disagree that *Bankers* should be read so broadly. First, and without belaboring the point, *Bankers* was decided prior to the adoption of both the Appellate Practice Act in 1965 and the Georgia Constitution of 1983, and it is apparent that the Court's analysis based on the then-existing supersedeas statute and since-revised constitutional provision would be materially different today. *Bankers*, 209 Ga. at 275-277. More importantly, we cannot simply engraft the reasoning in *Bankers*, or any other mandamus case, onto this case because the statute governing mandamus appeals specifically says – as it said at the time *Bankers* was decided – that those appeals "shall be heard . . . under the same laws and rules as apply in injunction cases." OCGA § 9-6-28 (b). *Bankers*, 209 Ga. at 277 (same). And our law is clear that there is no automatic supersedeas in an appeal from an order granting an injunction. See OCGA § 9-11-62 (a) ("Unless otherwise ordered by the court, an interlocutory or final judgment in an action for an injunction or in a

5

receivership action shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal.").[5]

There is no comparable language, however, in the statutes governing quo warranto. OCGA § 9-6-64 (a) directs a party dissatisfied with the final decision in a quo warranto proceeding to "file an appeal as in other cases[.]" While this language also appears in the mandamus statute, see OCGA § 9-6-28 (a), as explained above, the mandamus statute goes on to say in subsection (b) that appeals in those cases are "under the same laws and rules as apply in injunction cases[,]" while the quo warranto statute merely goes on to say that "the duties of the clerk shall be the same as in other cases" where appeals are filed. OCGA § 9-6-64 (a). Moreover, there is no doubt that the legislature knows how to exempt classes of cases from the automatic supersedeas provisions because not only did it do so in injunction and mandamus cases, but it also has done so in election contest cases, which often concern issues similar to those adjudicated in quo warranto cases. See OCGA § 21-2-528. But Petitioners have not cited, and we have not found, anything in the specific statutes

---

[5] There are numerous appellate cases holding that there is no automatic supersedeas in an appeal from an order granting an injunction. E.g. *Barnes v. Channel*, 303 Ga. 88, 92 (1), n.3 (810 SE2d 549) (2018); *Burton v. Glynn County*, 297 Ga. 548, 549 (4) (776 SE2d 179) (2015); *Brown v. Spann*, 271 Ga. 495, 496 (520 SE2d 909) (1999)

governing quo warranto proceedings, or any other statute, that exempts a judgment issued in a quo warranto proceeding from the automatic supersedeas provisions of OCGA § 5-6-46 (a). Accordingly, because we have found neither a statute nor controlling decisional law specifically exempting quo warranto proceedings from the automatic supersedeas provisions of OCGA § 5-6-46 (a), the trial court's order is not subject to reversal on this basis.

(b) Petitioners also argue that the automatic supersedeas provisions of OCGA § 5-6-46 do not apply because they sought, and the trial court granted, injunctive relief. Although, as stated above, it is true that orders granting injunctive relief are not subject to the automatic supersedeas set out in OCGA § 5-6-46 (a), we disagree that injunctive relief was granted here. The difference between a declaratory judgment and an injunction has been explained before: "A declaratory judgment is a means by which a superior court simply declares the rights of the parties or expresses its opinion on a question of law without ordering anything to be done. An injunction, by contrast, imposes an affirmative duty on the party enjoined to either perform – or refrain from performing – a specified act." (Citations and punctuation omitted.) *Burton*, 297 Ga. at 549-550 (4). In their quo warranto petition, Petitioners sought a "Declaration of Quo Warranto Judgment" specifically referencing both OCGA § 9-6-60 (quo

warranto statute) and 9-4-1 (declaratory judgment statute). And in their "Prayer for Relief," Petitioners sought "declaratory relief," judgment in quo warranto, attorney fees, expenses of litigation, and "such other and further relief as justice requires." In the final judgment, the trial court set out the relief granted as a series of adjudications and declarations and did not mention injunctive relief.[6] Further, Petitioners raised this argument in the trial court in support of their motion for contempt, and, although the trial court did not specifically address this issue in its supersedeas order, the trial court implicitly rejected this argument by concluding the automatic superseadeas applied here. *Burton*, 297 Ga. at 550 (4) (in deciding whether automatic supersedeas applied, trial court properly interpreted its order as declaratory judgment, not injunction). Accordingly, this argument is also unavailing and the supersedeas order is affirmed.

*Case No. A24A0449*

3. We turn now to the Respondents' challenges to the final judgment. In Case No. A24A0449, Morgan raises three enumerations of error: (a) that the trial court abused its discretion by striking his answer and defenses, (b) that the trial court erred

---

[6] Any claim that injunctive relief was granted because the final judgment ordered Respondents to return books, papers, electronic devices, and other items belonging to the City is unavailing since that remedy is specifically provided for in the quo warranto statute. See OCGA § 9-6-66.

8

by refusing to allow him to introduce certain evidence at one of the hearings, and (c) that the trial court erred by denying his motion to dismiss. We address each enumeration in turn.

(a) We first consider Morgan's contention that the trial court abused its discretion in striking his answer and defenses and entering a default judgment. We start with our standard of review.

> [R]ulings on motion to strike and for entry of default judgment are reviewed by this Court using an abuse of discretion standard. Indeed, a trial judge has broad discretion in the enforcement of the discovery provisions of the Civil Practice Act, and we will not interfere with the exercise of that discretion absent clear abuse. Nevertheless, dismissal and default are the harshest sanctions available for the trial court to impose, and we have cautioned against the use of these harsher sanctions except in extreme cases.

(Citation and punctuation omitted.) *Potts v. Clowdis*, 360 Ga. App. 581, 583 (1) (859 SE2d 875) (2021). Likewise, "[a] trial court has wide discretion in adjudicating spoliation issues, and such discretion will not be disturbed absent abuse." (Citation omitted.) *Phillips v. Harmon*, 297 Ga. 386, 397 (II) (774 SE2d 596) (2015). In addition to our standard of review, it is also important to note that our law specifically provides that "the provisions of [the Civil Practice Act] governing . . . discovery and

depositions . . . apply" to all "[special] proceedings[,]" such as quo warranto proceedings. See OCGA § 9-11-81.

In order to address this enumeration, it is necessary to set out in detail the discovery history between the parties. The record shows that Petitioners deemed Respondents' initial responses to their written discovery requests inadequate and sent Respondents a Uniform Superior Court Rule 6.4 letter in an effort to work out the dispute. Respondents did not reply, and, on January 25, 2023, Petitioners filed a motion to compel discovery. Respondents replied and argued, among other things, that since it was Petitioners' burden to prove that Respondents resided outside District 1, Respondents should not be compelled to present evidence to prove Petitioners' claims.

A hearing was held on the motion to compel on February 13, 2023. During the hearing, the trial court attempted to explain to the Respondents the parties' discovery rights under the Civil Practice Act and later cautioned them that, in the event the court issued an order compelling their responses and they failed to respond, the court could then strike their answers. On February 20, 2023, the trial court entered an order

on the motion to compel,[7] wherein the court made item-by-item rulings on the interrogatories the Respondents were compelled to answer and the documents they were compelled to produce. Respondents purported to comply with the trial court's order on the motion to compel by filing verified interrogatory responses and producing certain documents, including photographs of their rooms at their respective District 1 residences.

Petitioners then noticed Respondents' depositions for April 12, 2023. Respondents filed a motion to quash and, although they had not sought a protective order or otherwise obtained a ruling from the trial court excusing them from attending their depositions, Respondents failed to appear for their depositions on April 12. On May 5, 2023, Petitioners filed a motion to strike Respondents' answers and defenses based on discovery violations, specifically their failure to attend their depositions. On June 28, 2023, the trial court held a hearing on the motion to strike. After noting that Respondents had resisted discovery "from the outset of the proceedings" and while reserving the right "to more fully impose sanctions" at a later date, the trial court ordered Respondents to attend and answer questions at any properly-noticed

---

[7] Although the trial court entered a joint order on the two motions, the order was separately entered as to the two Respondents and the discovery rulings were specific to each of them.

deposition scheduled prior to July 15, 2023, which was two days before the case had been set for trial. Petitioners sent Respondents notices to take their video depositions, and Respondents were deposed on July 11, 2023.

During their depositions, Respondents were questioned extensively about where they resided, when they stayed at their District 1 residence, and various other questions designed to garner information about the central issue in this case. On many occasions, Respondents gave almost identical responses to the effect that they could not answer the questions because "I don't keep a record of that."[8] Further, both men referred to notes or their discovery responses when answering questions; when asked why they could not answer without referring to their notes, they explained that they wanted to remain "consistent as a pro se litigant" and to answer truthfully.[9]

---

[8] To be clear, Respondents were deposed separately but, as set out above, they often used the same phrasing in answering, or refusing to answer, similar questions.

[9] For instance, when Morgan was shown a picture of a bed, he had to refer to his "notes" before he could testify that it was the bed at his District 1 home. And Pollard had to refer to his notes before testifying who else lived at his District 1 "permanent residence." Pollard was requested by counsel to show him the notes he was referring to during the deposition, but Pollard refused, and the trial court was contacted by telephone; the trial court informed Pollard that opposing counsel had the right to see any documents he reviewed in answering questions during his deposition. The court also reminded Pollard that he had not yet ruled on Petitioners' motion for sanctions and that the court might look to what occurred during the deposition as dispositive of that motion.

Respondents were also questioned extensively about the photographs they provided in response to Petitioners' requests for production of documents. Pollard[10] testified that he could not say when the picture that he purported to be his bedroom at his District 1 residence was taken and explained that although he took the pictures with his phone, he could not use his phone to find the date he took it because the pictures were no longer on his phone. When repeatedly asked if he had deleted the pictures from his phone, Pollard would only respond that he took the pictures but "I do not have those pictures in my phone" or similar words without being able to offer any explanation of why the photographs were no longer on his phone.[11] When Morgan was asked if he had any pictures of his Pelham apartment,[12] he testified that he was sure he

---

[10] Although this Division deals with Morgan's enumeration of error, Pollard makes the same arguments in his appeal, which we address in Division 4, and it is helpful to set out examples from both Respondents' depositions to show the similarity of their responses.

[11] Some of Petitioners' questions about the photographs were formulated to show that the photographs Respondents provided of their District 1 residences were staged. They also deposed family members on this issue. During her deposition, Morgan's grandmother testified that she did not recognize the items in the photograph that Morgan submitted as a photograph of his room at his District 1 address. Pollard's sister also testified in her deposition that she did not recognize the items in the photograph supposedly taken in Pollard's bedroom at her house.

[12] Although he had been ordered to do so by the trial court, Morgan did not produce any photographs of his Pelham apartment.

had taken photographs but he did not have any on his phone now because it was a new phone. When pressed about his answer, Morgan said that he knew his new phone "was not present or on [his] person at the time he rented the Pelham apartment," but that he could not recall when he got his new phone.

The day after Respondents' depositions, Petitioners filed an emergency renewed motion to strike Respondents' answers and defenses based on various discovery violations, including their evasive and non-responsive deposition testimony, spoliation of evidence, and manufacturing evidence. The trial court held a hearing on the motion on July 17, 2023, during which various parts of Respondents' recorded depositions were played for the court. Following the hearing, the trial court entered the final judgment at issue here.

Morgan argues that the trial court abused its discretion in entering its final judgment because, in his view, he merely violated "the spirit of the law." But the trial court did not find that Respondents merely violated the spirit of the law. The trial court entered a lengthy and detailed order setting out Respondents' "willful and intentional discovery violations," while also emphasizing its own repeated warnings to Respondents about the right of each party to conduct discovery as well as the consequences of the failure to provide requested discovery. The court observed that

Respondents' stance appeared to be that they were exempt from discovery because they were pro se litigants and did not have the burden to prove Petitioners' claims. The trial court noted that it had assessed Respondents' credibility in relation to all discovery issues and in particular the spoliation issues based on the court's observations of Respondents' attitudes displayed in the courtroom and during their depositions. The trial court also set out specific findings with respect to Respondents' deposition testimony, including that they repeatedly evaded and refused to answer critical and relevant questions pertaining to their domicile, the authenticity of photographs, and other questions relating to the spoliation of evidence. Based on these and other findings, the trial court determined that severe sanctions were warranted based on "Respondents' express defiance of this Court's Orders as well as their willful and intentional discovery violations. The Respondents have breached their obligations not to spoliate evidence, violated the Court's order compelling discovery of photographic evidence, and further violated the Court's order compelling their depositions." The court further determined that Respondents' actions resulted in prejudice to Petitioners in a number of ways, including the prejudice they suffered as a result of not being able to prove their claim that Respondents manufactured evidence. On appeal, Morgan does not take issue with any of the trial court's specific

findings. Clearly, as set out in the trial court's order, Respondents' actions amounted to more than merely violating the spirit of the law.

Morgan, however, posits another argument – that the severe sanction of striking his pleadings was "not ripe for adjudication" because, Morgan says, he timely complied with all court orders. For this same reason, Morgan claims that his actions or failure to act cannot be considered intentional or willful. This argument – that he complied with the trial court's orders compelling discovery – is belied by the record, as discussed above. Indeed the trial court cited several bases for its order, including statutes, any of which would have warranted the striking of Morgan's answer and entry of a default judgment, and none of which Morgan challenges on appeal. For example, Morgan's failure to attend his first deposition, especially coupled with his evasive and nonresponsive testimony when he appeared at his second deposition, clearly warranted the imposition of sanctions, including the extreme sanction of striking his answer and entry of a default judgment. See OCGA § 9-11-37 (d) (1) (authorizing the striking of pleadings and the entry of a default judgment against a party who failed to attend their duly noticed deposition); *Dyer v. Spectrum Eng., Inc.*, 245 Ga. App. 30 (2) (537 SE2d 175) (2000) (same). And, contrary to Morgan's assertions, his pro se status and the alleged improper motives of the Petitioners did not

excuse his discovery violations. See OCGA § 9-11-37 (d) (2) (explaining that the failure to appear at a properly noticed deposition "may not be excused on the ground that the discovery sought is objectionable unless the party failing to attend has applied for a protective order"). Further, an order compelling attendance at a deposition is not necessary to authorize sanctions under OCGA § 9-11-37 (2), as long as the failure to attend was wilful. *Dyer*, 245 Ga. App. at 31-32 (2). Wilful in this circumstance simply means a conscious or intentional failure to act, id. at 32 (2), and Morgan makes no claim that his failure to attend his first deposition was due to accident or inadvertence.[13]

Lastly, it is important to note that the trial court gave Morgan every opportunity to avoid discovery sanctions; it was only when he demonstrated his unwillingness to participate in his deposition by giving evasive and non-responsive answers that the trial court imposed sanctions. See OCGA § 9-11-37 (a) (3) (providing that an evasive or incomplete answer in a deposition shall be treated as a failure to answer). Based on the foregoing, Morgan has failed to demonstrate that the trial court abused its

---

[13] Further, although Morgan argues "[i]n considering the issue of willfulness, the entire period beginning with service of the interrogatories" should be considered, see *Smith v. Nat. Bank*, 182 Ga. App. 55, 57 (2) (354 SE2d 678) (1987), he fails to recognize that this is exactly what the trial court did, as clearly set out in the final order.

discretion by imposing the extreme sanction of striking his answer and entering a default judgment on the quo warranto petition.

(b) Next, Morgan contends that the trial court erred by refusing to allow him to introduce evidence at the June 28, 2023 hearing regarding the Petitioners' allegedly improper motive in requesting "more" discovery and insisting on taking his deposition. First, it is clear to us that, despite the trial court's repeated attempts to explain the discovery process, Morgan failed to appreciate both the nature and scope of discovery.[14] As our Supreme Court explained in *General Motors, LLC v. Buchanan*, 313 Ga. 811 (874 SE2d 52) (2022), "the scope of discovery under the Civil Practice Act is broad." Id. at 814 (2). To this end, "[t]he discovery procedure is to be construed liberally in favor of supplying a party with the facts." (Citation and punctuation omitted.) Id. Morgan's assertions that Petitioners somehow had to offer definitive proof of their claims before they were entitled to discovery simply misapprehends the discovery process. And, as the trial court properly determined, what Morgan deems his "concerns that this case had political and other overtones"

---

[14] The trial court also repeatedly advised Respondents about the benefits of obtaining counsel, including at the June 28 hearing.

was irrelevant to the discovery sanction issues that were the subject of the June 28, 2023 hearing.[15] This enumeration is thus also without merit.

(c) Lastly, Morgan contends the trial court erred by denying his first motion to dismiss.[16] The record shows the first motion to dismiss was filed pursuant to OCGA § 9-11-12 (b) (6) and asserted that "[t]he preponderance of the evidence shows that Petitioners . . . have not and cannot produce enough probative evidence" to overturn their elections. The trial court denied the first motion to dismiss, finding that the quo warranto petition presented issues of fact that should be determined by a jury. Morgan alleges that this was error, arguing, in essence, that Petitioners were required to demonstrate that they will ultimately prevail in order to survive a motion to dismiss. That is incorrect.

---

[15] We make clear, however, that a party's right to discovery is not without boundaries. To that end, a party can seek a protective order for *good cause shown*. See OCGA § 9-11-26 (c). However, "[t]he movant has the burden of showing [his] entitlement to a protective order under this rule." *Buchanan*, 313 Ga. at 815 (2). We again stress that Respondents never moved for a protective order.

[16] The record shows that Respondents filed two motions to dismiss. Although Morgan does not specify, within this enumeration, whether he is challenging the denial of his first or second motion to dismiss, based on his arguments, it seems clear that this enumeration is limited to the denial of the first motion to dismiss. We will, therefore, confine our discussion accordingly.

It is well settled that a trial court may not grant relief on a 12 (b) (6) motion to dismiss for failure to state a claim unless

> (1) the allegations of the complaint disclose with certainty that the claims would not be entitled to relief under any state of provable facts asserted in support thereof; and (2) the movant establishes that the claimant could not possibly introduce evidence within the framework of the complaint sufficient to warrant a grant of the relief sought. . . . In deciding a motion to dismiss, all pleadings are to be construed most favorably to the party who filed them, and all doubts regarding such pleadings must be resolved in the filing party's favor.

(Citation and punctuation omitted.) *Scouten v. Amerisave Mtg. Corp.*, 283 Ga. 72, 73 (1) (656 SE2d 820) (2008). Viewing the petition, which set out specific allegations concerning Morgan's activities or non-activities with respect to his District 1 address and his apartment outside the district, as well as the law applicable to Petitioners' claims, it is clear that the trial court did not err in denying the motion. Accordingly, the final judgment is affirmed in Case No. A24A0449.

20

4. Turning to the claims raised by Pollard in his appeal, Pollard mostly echoes[17] Morgan's enumerations that the trial court erred by striking his answer and entering a default judgment,[18] by refusing to allow him to introduce evidence concerning Petitioner's motives, and by denying his first motion to dismiss. For the reasons stated in Division 3 (a), (b) and (c) above, Pollard's enumerations are also without merit.

5. Pollard also argues that the trial court erred by refusing to allow him to present testimony from his sister, Angel Williams, to rebut Petitioners' counsel's statements at the July 17, 2023 hearing concerning Williams' deposition testimony and the spoliation issue. The transcript from the hearing shows that Pollard was vague about why he wanted the witness to testify at the hearing, indicating he wanted the

---

[17] Any minor differences in the arguments Pollard asserts are not material to our analysis.

[18] We note that most of the trial court's findings and determinations were entered jointly against "Respondents." However, with the respect to the spoliation of evidence, it is worth clarifying that Morgan testified he no longer had the photographs at issue because he had a new phone, while Pollard repeatedly testified that the photographs were no longer on his phone but refused to answer any questions concerning whether or not he had deleted the compelled photographic evidence and refused to provide any other explanation concerning why the photographs were no longer on his phone.

witness to rebut "things that have been mentioned in the depositions that pertains to this proceeding and . . . some clarification that need[s] to be done" and never directly said that he wanted to rebut counsel's statements as it related to the spoliation issue. The trial court asked Pollard whether Williams' testimony went to the merits of where he lived, and Pollard responded, "yes, indeed." The trial court then disallowed Williams' testimony, but assured Pollard that the court would ignore hearsay statements made by counsel. Pollard then withdrew his request to call the witness. Under these circumstances, where Pollard never clearly articulated why he wanted the witness to testify and then withdrew his request to call the witness, he cannot now complain that the trial court erred by refusing to allow the witness to testify. The final judgment is also affirmed in Case No. A24A0450.

*Judgments affirmed. Barnes, P. J., and Gobeil, J., concur.*